MILLER, Judge.
Plaintiffs Isaac Foreman Hawkins, et al, the record owners, appeal the dismissal of their petitory action. The trial court held defendant Johnny Burleigh established thirty years adverse possession. We reverse.
This litigation commenced in February 1970 as a possessory action brought by Burleigh. During the course of the litigation, issues have been presented to four different trial judges. Burleigh’s discovery deposition was taken in March 1970 and contained admissions inconsistent with his claim of 30 years adverse possession. The attorney representing Burleigh when the possessory action was filed made no further appearance, so far as the record indicates.
The 1975 recognition of Burleigh’s title based on thirty years possession was based primarily on a prior holding by another judge which was in turn based on evidence taken by depositions in August 1970. The deciding judge’s only reference to these depositions by Burleigh’s three disinterested witnesses appears in the trial judge’s written reasons, which appear at Tr. 9 of the record in the petitory action, as distinguished from the record in the posses- *360 sory action. The trial judge explained that since Burleigh’s possession had been recognized by another trial judge, he “feels this to be the case also, and [holds] that the Burleighs [note the plural reference to Burleigh’s father’s prior possession] have been in continuous possession of the property from the turn of the century until the present.”
The only issue presented in the possesso-ry action filed in February 1970 concerned defendant Johnny Burleigh’s possession for the year preceding the insitution of suit. LSA-C.C.P. art. 3658(2). In the possesso-ry action, Burleigh established that he fenced the property and drilled a waterwell on it in 1967 or 1968. About the same time he placed several cows on the tract and maintained exclusive possession from that date. The holding by another judge that Burleigh established possession from 1967 was eminently correct, but this decision was not concerned with Burleigh’s prior possession.
We reverse the trial court’s holding that Burleigh carried the burden to establish he commenced continuous adverse possession from the 1932 date of his father’s death.
The Hawkins established record title. They continuously paid taxes on the disputed tract and granted mineral leases on the tract from time to time. The Bur-leighs never paid taxes or granted leases.
Burleigh’s father, E. L. Burleigh, was disabled as a child. He was brought to Hawkins’ ancestor in title, Dr. J. E. Hawkins, who cared for him and raised him. Dr. J. E. provided E. L. with a small house near his own home. When E. L. reached a marriagable age in about 1896, Dr. J. E. moved the small house to the disputed 18 acre tract. Tr. 54. E. L. was disabled and could not perform manual work, but he “worked” (Tr. 45) for Dr. J. E., or acted as a “straw-boss”, “supervisor” (Tr. 69), “kind of like a little slave” (Tr. 128), for Dr. J. E. The doctor had over twenty-five families farming his properties and E. L. looked after the doctor’s interest as to whatever needed attention.
Although Burleigh’s witnesses knew his father, E. L., and Dr. J. E., they did not know anything about the doctor’s financial arrangements with E. L. They never heard the doctor say anything about the 18 acre tract belonging to E. L. They did hear E. L. say the doctor had given the property to him. These witnesses testified the 18 acre tract had always been grazed because it was not fit for farming. They testified that E. L. was unable to fence and maintain the property, but E. L.’s illegitimate son Johnny Burleigh (the defendant) did this work.
Burleigh testified that while his father lived on the place, Burleigh farmed watermelons, tomatoes, and peanuts. All witnesses agreed that one of E. L.’s prime occupations was making whiskey. Tr. 32, 47, 69, 151. When E. L. died in 1932, Bur-leigh took over the still on the 18 acre tract and when he got caught he operated stills on other properties. Tr. 151.
Burleigh’s father had legitimate children who inherited E. L.’s property, but they never claimed the eighteen acre tract.
Johnny Burleigh’s testimony was characterized by its contradictions. At one time he testified his father died in 1936 and Burleigh left the home place in the late 30ies. But Burleigh was more convincing when he indicated his father died in 1932 and he left the home place in 1934. Bur-leigh testified at the June 1971 trial of an exception (Tr. 160 of the possessory action), that he “didn’t do anything” to the property from 1932 until he had a water-well drilled in about 1967. When asked why he didn’t do anything at all on the land until 1967, he replied: — “I figured I could do anything I wanted with it, it was mine, I just didn’t go to . . .” Tr. 161.
Burleigh was born in 1912 and lived on the disputed tract until 1934. After his father died, Burleigh made whiskey and did construction work. When his work on the Chicot school was completed in 1934, Bur- *361 leigh moved with the contractor to do construction work in other parts of Louisi-sana. He returned to Chicot in 1946 when he and his wife built a home on his wife’s 40 acre tract located some four miles from the disputed tract.
Although Burleigh testified he thought he owned the property all this time, his first attempt at adverse possession occurred in 1967 or 1968 when he fenced the property and had a waterwell drilled on it. He placed cattle on the property and claimed the disputed tract for his own. In 1969 or 1970, the Hawkins ordered him off the property and this litigation commenced.
The testimony of Burleigh and his independent witnesses established there were vestiges of E. L.’s fence around the property from 1932 until Burleigh fenced the tract in 1967 or 1968. This fencing inured to the benefit of Burleigh’s father E. L. and to his legitimate descendants who have not claimed the property. Although Bur-leigh indicated he repaired the fences from time to time after 1932 and before 1968, the disinterested witnesses were adamant that the 18 acre tract was open range. As one of Burleigh’s witnesses testified on direct examinationas of the 1940ies “. there ain’t no fence from here to Oakdale, it’s all opened back there.” Tr. 62 of the possessory action. When the fence was down, it was open range and everyone’s cows grazed the area. Tr. 59. Another witness testified that when Burleigh left in 1934 “he left the same fence that was there when the old man was there.” When Burleigh left, the tract “all went down to nothing.” Tr. 35. The majority of the fence fell down and the posts rotted. Tr. 36. The tract was open range and the witnesses’ cattle grazed the tract. Tr. 36, 37. The entire area was public. Tr. 39, 59, 61.
Another of Burleigh’s witnesses, Mr. H. E. Lewis, admitted he never saw Johnny Burleigh from the time he left in 1934 until the late 1960ies. Tr. 89.
Typical of Burleigh’s disinterest in the property after he left in 1934 is his total unconcern when the eight or nine room house located on the disputed tract burned to the ground a few months after he left. Burleigh testified: — “I never did check about anything after the house had burned, it never did cross my mind.” Tr. 124, 125 of the possessory action.
Until the petitory action was tried in 1975, the testimony was uniform that the only adverse possession exercised by Bur-leigh from 1934 until 1946 was that he “passed by” the property from time to time. Tr. 164 of the petitory action. The entirety of Burleigh’s brief testimony at the 1975 trial was his explanation that “passed by” meant he walked over the place and checked the fences, patched the fences, and would pick crabapples on the place to make jelly. That is the only live testimony Burleigh presented to the trial judge at the 1975 trial, and even this is contradicted by his prior deposition, his testimony at a prior hearing, and the depositions of his three independent witnesses which he offered in evidence.
In summary, Burleigh admits he was unconcerned when the house burned a few months after he moved away. From 1934 to 1967 he did nothing more than walk across the property and pick crabapples which in no way suggested he was maintaining adverse possession. Burleigh’s strongest claim lies in the civil possession allegedly maintained through vestiges of fences. He is not an heir to his father’s property and did not acquire the property by conveyance or donation. He is not entitled to “tack” or benefit directly from the possession of his father. Burleigh cannot benefit indirectly by ascribing to himself possession based on “works”, fences, erected during his father’s occupancy. For Burleigh to maintain his possession through works not his own, he must establish his right to them. And this he failed to do.
Burleigh is therefore not entitled to assert possession in himself through the remains of his father’s fences. There was *362 no possession attributable to Burleigh from 1934 until 1967. His uninterrupted adverse possession commenced in that year and is far less than the thirty years required to acquire ownership by prescription.
The trial judge improperly concluded that another trial judge held Burleigh proved continuous adverse possession from the 1932 date of his father’s death. Bur-leigh failed to prove he established adverse possession prior to 1967.
Since the Hawkins established record title, the burden shifted to Burleigh to prove his thirty years adverse possession. Tinney v. Lauve, 280 So.2d 588, 590 (La.App. 4 Cir. 1973). Burleigh did not meet the requirements of LSA-C.C. art. 3500, for he did not occupy the land for the thirty year period unequivocally as owner, or in an exclusionary manner.
The trial court judgment is reversed and set aside. Plaintiffs’ record title to the disputed tract is recognized. Costs of court at trial and on appeal are taxed to defendant Johnny Burleigh.
REVERSED and RENDERED.